**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

TOWN OF HUNTINGTON and DIX HILLS
WATER DISTRICT,

                     Plaintiffs,

    **-against-**

THE DOW CHEMICAL COMPANY,
FERRO CORPORATION, and
VULCAN MATERIALS COMPANY,

                     Defendants.

**Complaint for a Civil Case**

Case No.   19-cv-2986

Jury Trial Demanded

# **Table of Contents**

I.     **Introduction** ......................................................................................... 1

II.    **Parties** ................................................................................................... 2

III.   **Jurisdiction and Venue** ....................................................................... 4

IV.   **Factual Allegations** ............................................................................. 4

     A.     The Contaminant: 1,4-Dioxane ....................................................... 4

     B.     Regulatory Standards Applicable to 1,4-Dioxane ........................... 6

     C.     Defendants' Knowledge of 1,4-Dioxane's Hazards ........................ 7

     D.     Harm Resulting from 1,4-Dioxane in the District's Wells............... 10

V.     **Causes of Action** ................................................................................. 11

     FIRST CAUSE OF ACTION
     Strict Products Liability for Defective Design ................................... 11

     SECOND CAUSE OF ACTION
     Strict Products Liability for Failure to Warn..................................... 14

     THIRD CAUSE OF ACTION
     Negligence......................................................................................... 16

     FOURTH CAUSE OF ACTION
     Public Nuisance................................................................................. 17

     FIFTH CAUSE OF ACTION
     Trespass............................................................................................. 18

VI.   **Prayer for Relief** ................................................................................. 20

VII.   **Demand for Jury Trial**........................................................................ 21

## I. Introduction

1. Plaintiff Dix Hills Water District ("the District") is a public drinking water provider serving approximately 41,000 residents and businesses in Suffolk County, New York.

2. Plaintiff the Town of Huntington ("the Town," and collectively with the District, "Plaintiffs") operates the District. Plaintiffs bring this action to recover the substantial costs necessary to protect the public and restore the District's damaged drinking water supply wells, which are contaminated by the toxic chemical 1,4-dioxane.

3. 1,4-Dioxane is a highly toxic substance and likely human carcinogen that is an ingredient, component, contaminant, and/or impurity in certain industrial and commercial products. 1,4-Dioxane and/or products containing 1,4-dioxane were used and discharged in the vicinity of the District's drinking water production wells. 1,4-Dioxane has migrated from multiple sources through the subsurface and into the groundwater, and now contaminates the District's water.

4. The defendants in this action are manufacturers, distributors, retailers, and promoters of 1,4-dioxane and/or industrial products that contain 1,4-dioxane that caused the contamination of the District's wells. The Defendants knowingly and willfully manufactured, promoted, and/or sold products containing 1,4-dioxane to industrial facilities and consumers in Suffolk County, when they knew or reasonably should have known that this harmful compound would inevitably reach groundwater, significantly pollute drinking water wells, render drinking water unusable and unsafe, and threaten the public health and welfare, as it has done and will continue to do with respect to the District's wells.

5. Plaintiffs file this lawsuit to recover compensatory damages and all other remedies, including but not limited to all necessary funds to reimburse them for the costs of

designing, constructing, installing, operating, and maintaining the treatment facilities and equipment required to remove the 1,4-dioxane from its drinking water wells, and all associated costs, and to ensure that the parties responsible for the drinking water contamination bear these expenses, rather than Plaintiffs and their ratepayers.

## II.     Parties

6.      **Plaintiff Dix Hills Water District** is a public drinking water provider that serves a population of 41,000 in the Town of Huntington. Dix Hills Water District maintains and operates seventeen municipal supply wells distributed throughout its service area in Suffolk County.

7.      **Plaintiff The Town of Huntington** is a municipal corporation that operates Dix Hills Water District.

8.      The District's wells are contaminated and/or threatened by 1,4-dioxane contamination spreading throughout the aquifer system from which the District draws the drinking water supply.

9.      Plaintiffs have a duty to exercise due care and diligence in the maintenance and supervision of its public water system to prevent its pollution and depletion pursuant to 10 NYCRR § 5-1.71.

10.     Plaintiffs have a duty to exercise due care and diligence in the maintenance and supervision of its public water system to ensure the protection of the public health pursuant to 10 NYCRR § 5-1.51.

11.     In carrying out its powers, duties, and responsibilities, Plaintiffs act in all respects for the benefit of the people of the Town of Huntington, Dix Hills Water District, and the State of New York, for the protection of their health, welfare, and prosperity.

12.     At all times relevant to this action, the following defendants designed, manufactured, formulated, marketed, promoted, distributed, sold, and/or otherwise supplied (directly or indirectly) 1,4-dioxane and/or products containing 1,4-dioxane such that each defendant knew or should have known that 1,4-dioxane would be delivered into areas contaminating the District's water supply wells.

    a.  **Defendant Dow Chemical Company** is a Delaware corporation with its principal office in Midland, Michigan, which at all times relevant to this action was doing business in New York.

    b.  **Defendant Ferro Corporation** is an Ohio corporation with its principal office in Mayfield Heights, Ohio, which at all times relevant to this action was doing business in New York.

    c.  **Defendant Vulcan Materials Company** is a New Jersey corporation with its principal place of business in Birmingham, Alabama, which at all times relevant to this action was doing business in New York.

13.     When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment, or agency.

14.     All references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

## III. Jurisdiction and Venue

15.     The United States District Court for the Eastern District of New York has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy is between citizens of different states and exceeds the sum of $75,000.

16.     This Court has jurisdiction over Defendants because, based on information and belief, each Defendant has sufficient minimum contacts in New York or otherwise intentionally avails itself of the New York market either through the distribution or sale of products containing 1,4-dioxane in the State of New York so as to render the exercise of jurisdiction over it by this Court consistent with traditional notions of fair play and substantial justice. Each Defendant is a corporation or other business authorized to do business in New York and registered with the New York Secretary of State.

17.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events, omissions, and harms giving rise to this case occurred, or a substantial part of the property that is the subject of this action, is situated in the Eastern District of New York.

## IV. Factual Allegations

### A. The Contaminant: 1,4-Dioxane

18.     1,4-Dioxane is a synthetic industrial chemical that does not occur in nature. Highly toxic and extremely persistent in the environment, 1,4-dioxane poses a risk to human health and safety.

19.     In the United States, 1,4-dioxane was primarily manufactured by Dow Chemical Company and Ferro Corporation. A third company, Union Carbide, also manufactured 1,4-dioxane but merged with Dow Chemical in 2001.

20.     1,4-Dioxane was most widely used in industrial settings as a stabilizer for chlorinated solvents, primarily methyl chloroform, also known as 1,1,1-trichloroethane ("TCA"), which was used to dissolve greasy and oily substances from machined metal products and as a septic tank and drain cleaner, among other uses. Widespread use of TCA stabilized by 1,4-dioxane started in the 1950s and continued until 1996, when the Montreal Protocol banned TCA for its role in depleting the ozone layer. Even after its ban, TCA was still widely used under an exemption from the ban for "existing stocks," and was still manufactured in the United States at significant production volumes for certain uses in medical devices and aviation safety until January 1, 2005.

21.     The technology for 1,4-dioxane stabilization of TCA was owned, and licensed, by Defendant Dow Chemical Company, the market leader in production of both TCA and 1,4-dioxane. Defendant Vulcan Materials Company licensed this process from Dow and produced 1,4-dioxane-stabilized TCA.

22.     1,4-Dioxane has unique characteristics that cause extensive and persistent environmental contamination. Specifically, it is (1) mobile—that is, because it is entirely soluble (miscible) in water and does not adsorb (stick) to soil particles, it is readily transported through the soil and into groundwater where it can migrate long distances; and (2) persistent—that is, it does not readily biologically or chemically degrade in the environment nor is it removed by conventional treatment systems for drinking water. In sum, once it is applied, discharged, disposed of, or otherwise released onto land, 1,4-dioxane migrates through the subsurface and into groundwater, resists natural degradation, and is difficult and costly to remove from water.

23.     1,4-Dioxane contamination presents a significant threat to public health and welfare. The U.S. Environmental Protection Agency (EPA) classifies 1,4-dioxane as "likely to be carcinogenic to humans." 1,4-Dioxane also causes liver and kidney damage.

24.     1,4-Dioxane is fungible: 1,4-Dioxane made and/or used by one Defendant is chemically identical to 1,4-dioxane made and/or used by any other Defendant. Using currently accepted scientific methods, it is impossible, based on the chemical's physical characteristics, to identify the manufacturer of the 1,4-dioxane or the product containing the 1,4-dioxane.

25.     Once released into the environment, 1,4-dioxane lacks characteristics or a chemical signature that would enable identification of the specific company that manufactured the product, based on any physical characteristics. Even when it is possible to identify a source of a plume of 1,4-dioxane, it is impossible, based on any physical characteristics, to identify what portions of commingled 1,4-dioxane was manufactured or supplied by any particular Defendant.

**B.      Regulatory Standards Applicable to 1,4-Dioxane**

26.     No federal or state agency has approved 1,4-dioxane as an additive to drinking water at any level. No federal or state agency has approved releasing or discharging 1,4-dioxane to groundwater in any amount.

27.     Currently, there is no enforceable federal or New York State drinking water standard specific to 1,4-dioxane.

28.     1,4-Dioxane is regulated as an "unspecified organic contaminant" by the New York State Department of Health under a generic "maximum contaminant level" (MCL) of 50 parts per billion (ppb).[1] None of the District's wells has ever exceeded this generic standard.

29.     State legislation passed in 2017 requires all New York-based water systems to test for 1,4-dioxane contamination.

30.     In September 2017, Governor Cuomo appointed 12 members to a new Drinking Water Quality Council tasked with ensuring all New Yorkers have access to safe and clean drinking water. The Council's initial responsibility includes recommending an enforceable MCL for 1,4-dioxane as a priority emerging contaminant that remains unregulated by the federal government. On December 18, 2018, the Council met and recommended an MCL of 1 ppb for 1,4-dioxane, rendering enforcement imminent.

31.     An MCL governs the relationship between public water suppliers, including Plaintiffs and the State of New York. It is not a license to pollute up to the MCL.

**C.     Defendants' Knowledge of 1,4-Dioxane's Hazards**

32.     Defendants knew or should have known of the grave harm and threat to public health and the environment presented by proliferating use of 1,4-dioxane products. Specifically, at all times relevant to this action, Defendants knew or reasonably should have known, among other things, that: (a) 1,4-dioxane is toxic to humans; and (b) when products containing 1,4-dioxane are applied, discharged, disposed of, or otherwise released onto land, 1,4-dioxane readily migrates through the subsurface, mixes easily with groundwater, and once present in water, resists natural degradation, renders drinking water unsafe and/or non-potable, and requires

---

[1] New York's MCL is denominated in micrograms per liter (μg/L); this measure is equivalent to parts per billion. *See, e.g.*, Zane Satterfield, "What Does ppm or ppb Mean?," Nat'l Envtl. Servs. Ctr., W. Va. Univ., at 1 (2004), *available at* http://nesc.wvu.edu/ndwc/articles/ot/fa04/q&a.pdf.

significant expense to remove from public drinking water wells. Defendants' own research establishes their knowledge of these characteristics of 1,4-dioxane.

33.     At all times relevant to this action, Defendants have been among the nation's most sophisticated and technically advanced companies in many areas, including chemistry, organic chemistry, analytical chemistry, methods of subsurface investigation, and other areas. As such, they were uncommonly well-positioned to evaluate the potential for the application of their products to result in groundwater contamination.

34.     The general mechanisms by which groundwater becomes contaminated with persistent organic compounds, including 1,4-dioxane, have been described in technical literature with which the Defendants were or should have been familiar since at least the 1940s.

35.     At all times relevant to this action, Defendant producers of 1,4-dioxane and TCA stabilized with 1,4-dioxane knew or reasonably should have known that the degreasing equipment used by metal product manufacturers and other industrial facilities routinely leaked or otherwise released TCA—and, therefore necessarily 1,4-dioxane—into the environment.

36.     At all times relevant to this action, Defendant producers of 1,4-dioxane and TCA stabilized with 1,4-dioxane knew that the primary use of their product, i.e. vapor degreasing, significantly concentrates 1,4-dioxane in the waste stream. Because 1,4-dioxane boils at a higher temperature than TCA, a relatively high proportion of 1,4-dioxane remains as a liquid during vapor degreaser operations. Vapor degreasing causes TCA to be lost to the atmosphere, requiring operators to periodically add TCA to the tank. Consequently, while TCA was stabilized with between 2.5 and 4.5% 1,4-dioxane by weight, Dow Chemical's publications and patents show that after use of 1,4-dioxane-stabilized TCA in vapor degreasing operations, the ending concentration of 1,4-dioxane was often as high as 15 to 25%. Waste TCA removed from vapor

degreasers therefore typically included high concentrations of 1,4-dioxane with great potential to contaminate large volumes of groundwater. Moreover, it was foreseeable to Defendants—indeed, it was well known—that such wastes were often disposed of onto land, where they migrated into groundwater.

37.     Defendants knew or should have known that routine solvent handling, use, and disposal practices led to frequent and substantial releases from facilities using 1,4-dioxane-related compounds. Users of chlorinated solvents, including TCA produced by Defendants, routinely disposed of waste solvents by pouring them onto the ground or into trenches for evaporation or burning. In addition, solvent use and recovery systems by design produced wastewater with very high concentrations of 1,4-dioxane and also routinely malfunctioned and/or otherwise discharged solvent containing 1,4-dioxane, resulting in releases to surface and groundwater. Defendants were at all times aware of these practices and foreseeable equipment malfunctions and spills, and the likelihood of releases to the ground and groundwater of solvents containing 1,4-dioxane. Indeed, users of chlorinated solvents, including TCA, were routinely advised by Defendants themselves to dispose of waste solvents by pouring them onto the ground or into trenches for evaporation or burning. These practices resulted in significant soil and groundwater contamination from metals fabrication and other industrial solvent release sites during the height of TCA use in the 1960s through the 1990s.

38.     Defendants knew or should have known that routine use and disposal of TCA-containing septic tank and drain cleaners would result in releases of 1,4-dioxane to groundwater. TCA-containing septic tank, cesspool, and drain cleaners were widely used in the 1960–1980 timeframe. A leading brand, Drainz, was manufactured by a company with operations in Islip, Suffolk County, New York, and was widely used on Long Island. Drainz was recommended to

be used in quantities ranging from a quart every 2–3 months to one-time applications of 2 gallons. Defendants knew or should have known that this application of their TCA products would result in releases to groundwater through septic tank leaking or sewer exfiltration.

39.     Despite knowing or having reason to know that long-term groundwater contamination and pollution of water wells were inevitable consequences of the foreseeable uses of their products without proper precautionary measures, including but not limited to adequate warnings, Defendants nonetheless promoted, marketed, and or/sold such products in the vicinity of the District's wells and elsewhere without providing any such warnings.

40.     At all times relevant to this action, Defendants developed, tested, patented, and generally knew of the existence of feasible alternative stabilizers to obviate the use of 1,4-dioxane to stabilize TCA.

41.     At all times relevant to this action, Defendants manufactured, tested, or were otherwise aware of alternative solvents that would have eliminated the use of TCA stabilized by 1,4-dioxane. For example, trichloroethylene ("TCE"), which did not contain 1,4-dioxane, was used for vapor degreasing at significant volumes throughout all time periods relevant to this action.

42.     Despite knowing or having reason to know of 1,4-dioxane's toxic properties and propensity to contaminate groundwater, and despite the existence of feasible alternative designs that did not contain 1,4-dioxane, Defendants nonetheless manufactured, promoted, marketed, and/or sold TCA containing 1,4-dioxane that was used in the vicinity of the District's wells.

**D.     Harm Resulting from 1,4-Dioxane in the District's Wells**

43.     The District meets its constituents' demand for water exclusively from municipal supply wells that draw from the Long Island Aquifer System, designated by the EPA as a "sole

source" aquifer under the Safe Drinking Water Act, 42 U.S.C. § 300h-3(3), in 1975. A sole source aquifer is one that is "the sole or principal drinking water source for the area and which, if contaminated, would create a significant hazard to public health." The EPA observed that "contamination of the aquifer system underlying Nassau and Suffolk Counties, New York, would pose a significant hazard to those people dependent on the aquifer system for drinking purposes."

44.     1,4-Dioxane has been detected in varying amounts at varying times in the District's wells. In addition, 1,4-dioxane's high mobility and persistence in soil and groundwater means it will likely continue to spread to affect even more of the District's wells in the future.

45.     The chlorinated solvent TCA and its constituent 1,4-dioxane produced by Defendants is a major source of 1,4-dioxane released to the groundwater that supplies the District's production wells. 1,4-dioxane has reached groundwater from the routine, foreseeable, and intended use and disposal of Defendants' TCA in the vicinity of the District's wells from nearby industrial manufacturing facilities and from TCA-containing septic tank cleaners used throughout the District's service area.

46.     Plaintiffs have taken and will take certain responsive measures to address 1,4-dioxane contamination in its wells attributable to Defendants' tortious conduct, such as investigating and monitoring for 1,4-dioxane contamination in those wells; and planning for and/or implementing infrastructural and operational measures to ensure Plaintiffs are prepared to meet all applicable and anticipated water quality standards.

## V.     Causes of Action

### FIRST CAUSE OF ACTION
### Strict Products Liability for Defective Design

47.     Plaintiffs reallege each of the preceding paragraphs and incorporate each such paragraph as if fully stated herein.

48.     As commercial designers, manufacturers, distributors, suppliers, sellers, and/or marketers of products containing 1,4-dioxane, Defendants had a strict duty not to place into the stream of commerce a product that is unreasonably dangerous.

49.     Defendants knew that third parties would purchase products containing 1,4-dioxane and use them without inspection for defects.

50.     Products containing 1,4-dioxane purchased or otherwise acquired (directly or indirectly) from Defendants by third parties were applied, discharged, disposed of, or otherwise released onto lands and/or water in the vicinity of Plaintiffs' drinking water production wells. Such discharges occurred at various locations, at various times, and in various amounts.

51.     The products containing 1,4-dioxane purchased by third parties were used in a reasonably foreseeable manner and without substantial change in the condition of such products.

52.     Defendants knew or reasonably should have known that the use of products containing 1,4-dioxane in their intended manner would result in the spillage, discharge, disposal, or release of 1,4-dioxane onto land or into water.

53.     The products containing 1,4-dioxane used in the vicinity of Plaintiffs' drinking water production wells were defective in design and unreasonably dangerous because, among other things:

    a.  1,4-Dioxane causes extensive and persistent groundwater contamination when it, or products containing it, are used in their foreseeable and intended manner.

    b.  1,4-Dioxane contamination in drinking water poses significant threats to public health and welfare.

c. Defendants failed to conduct and/or failed to disclose reasonable, appropriate, or adequate scientific studies to evaluate the environmental fate and transport and potential human health effects of 1,4-dioxane.

54. At all times relevant to this action, products containing 1,4-dioxane were dangerous to an extent beyond that which would be contemplated by the ordinary consumer, and/or the foreseeable risk of harm to public health and welfare posed by 1,4-dioxane outweighed the cost to Defendants of reducing or eliminating such risk.

55. Defendants knew or should have known about feasible alternatives to TCA and/or alternatives to producing TCA without the use of 1,4-dioxane, and the omission of such alternative designs rendered Defendants' products not reasonably safe.

56. As a direct and proximate result of the defects previously described, several of Plaintiffs' wells have been, and continue to be, contaminated with 1,4-dioxane in varying amounts over time, causing Plaintiffs significant injury and damage.

57. As a direct and proximate result of the Defendants' acts and omissions as alleged herein, Plaintiffs have incurred, is incurring, and will continue to incur damages related to 1,4-dioxane contamination of the wells in an amount to be proved at trial.

58. Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including 1,4-dioxane contamination of drinking water wells. Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of 1,4-dioxane and/or products containing 1,4-dioxane, in conscious disregard of the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiffs request an award of punitive damages in an

amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

59.     Defendants are strictly, jointly and severally liable for all such damages, and Plaintiffs are entitled to recover all such damages and other relief as set forth below.

## SECOND CAUSE OF ACTION
### Strict Products Liability for Failure to Warn

60.     Plaintiffs reallege each of the preceding paragraphs and incorporate each such paragraph as if fully stated herein.

61.     As designers, manufacturers, distributors, sellers, suppliers, and/or marketers of 1,4-dioxane and/or products containing 1,4-dioxane, Defendants had a strict duty to warn against latent dangers resulting from foreseeable uses of their products that Defendants knew or should have known about.

62.     Defendants knew that third parties would purchase products containing 1,4-dioxane and use them without inspection for defects.

63.     Products containing 1,4-dioxane purchased or otherwise acquired (directly or indirectly) from Defendants by third parties were applied, discharged, disposed of, or otherwise released at various locations, at various times, and in various amounts onto the lands and/or water in the vicinity of Plaintiffs' drinking water production wells.

64.     The products containing 1,4-dioxane purchased by third parties were used in a reasonably foreseeable manner and without substantial change in the condition of such products.

65.     Defendants knew or should have known that the use of products containing 1,4-dioxane in their intended manner would result in the discharge, disposal, or release of 1,4-dioxane onto land or into water.

66. The products containing 1,4-dioxane used in the vicinity of Plaintiffs' drinking water production wells were defective in design and unreasonably dangerous products for the reasons set forth in Paragraphs 52, 53, and 54.

67. Despite the known and/or reasonably foreseeable hazards to human health and welfare associated with the use of products containing 1,4-dioxane in the vicinity of Plaintiffs' drinking water production wells, including contamination of public drinking water wells with 1,4-dioxane, Defendants failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

68. In particular, Defendants failed to describe such hazards or provide any precautionary statements regarding such hazards in the labeling of their products containing 1,4-dioxane or otherwise.

69. As a direct and proximate result of Defendants' failure to warn of the hazards posed by disposal or release of products containing 1,4-dioxane in the vicinity of subterranean public drinking water wells that were, or reasonably should have been, known to them, 1,4-dioxane contaminates several of the District's wells in varying amounts.

70. As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiffs have incurred, is incurring, and will continue to incur damages related to 1,4-dioxane contamination of the wells in an amount to be proved at trial.

71. Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including 1,4-dioxane contamination of drinking water wells. Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of 1,4-dioxane and/or products containing 1,4-dioxane, in conscious disregard to

the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiffs request an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

72. Defendants are strictly, jointly and severally liable for all such damages, and Plaintiffs are entitled to recover all such damages and other relief as set forth below.

### THIRD CAUSE OF ACTION
### Negligence

73. Plaintiffs reallege each of the preceding paragraphs and incorporate each such paragraph as if fully stated herein.

74. As commercial manufacturers, sellers, distributors, suppliers, marketers, and/or designers of 1,4-dioxane products, Defendants owed a duty of care to Plaintiffs not to place into the stream of commerce a product that was in a defective condition and unreasonably dangerous to drinking water in Plaintiffs' service area.

75. Defendants breached this duty by negligently designing, formulating, manufacturing, distributing, selling, supplying, and/or marketing such unreasonably dangerous products into the stream of commerce, including in Plaintiffs' service area, even when they knew or should have known about the dangers 1,4-dioxane posed to drinking water wells.

76. As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiffs have incurred, are incurring, and will continue to incur damages related to 1,4-dioxane contamination of its wells in an amount to be proved at trial.

77. Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including 1,4-dioxane contamination of drinking water wells. Defendants committed each of the above-described acts and omissions

knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of 1,4-dioxane and/or products containing 1,4-dioxane, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiffs request an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

78.     Defendants are jointly and severally liable for all such damages, and Plaintiffs are entitled to recover all such damages and other relief as set forth below.

## FOURTH CAUSE OF ACTION
### Public Nuisance

79.     Plaintiffs reallege each of the preceding paragraphs and incorporate each such paragraph as if fully stated herein.

80.     Plaintiffs provide drinking water from the District's wells to residents and businesses for drinking, bathing, cleaning, washing, and other uses.

81.     Because Plaintiffs are a public entities, the water they provide to those residents and businesses is a public or commonly held resource. Members of the public have a right to have their water remain clean and potable, free of contamination by toxic man-made compounds.

82.     Defendants' acts and omissions, including their manufacture, promotion, marketing, sale, distribution, supply, defective design of, and/or failure to warn regarding 1,4-dioxane in their products, contaminated the District's wells, rendering water served from them a public health hazard and unfit for human consumption.

83.     Consequently, Defendants substantially interfered with and caused damage to a public or common resource that endangered public property, as well as the health, safety, and

comfort of a considerable number of persons. Such action creates, contributes to, or maintains a public nuisance.

84. As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiffs have incurred, are incurring, and will continue to incur damages related to 1,4-dioxane contamination of its wells in an amount to be proved at trial.

85. As an owner of water production wells and purveyor of drinking water, Plaintiffs suffer injuries different in kind from the community at large because it relies entirely upon its groundwater production wells for its public service functions.

86. Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including 1,4-dioxane contamination of drinking water wells. The Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of 1,4-dioxane and/or products containing 1,4-dioxane, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiffs request an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

87. Defendants are jointly and severally liable for all such damages, and Plaintiffs are entitled to recover all such damages and other relief as set forth below.

## FIFTH CAUSE OF ACTION
### Trespass

88. Plaintiffs reallege each of the preceding paragraphs and incorporate each such paragraph as if fully stated herein.

89.     Plaintiffs own and possess their drinking water production system, including drinking water production wells that extract groundwater in Plaintiffs' service area.

90.     Plaintiffs actually and actively exercise their rights to appropriate and use groundwater drawn from its wells.

91.     Plaintiffs did not give any Defendant permission to cause 1,4-dioxane to enter their groundwater wells.

92.     Defendants knew or reasonably should have known that 1,4-dioxane has a propensity to infiltrate groundwater aquifers when released to the environment; is a mobile and persistent groundwater contaminant capable of moving substantial distances within aquifers; is toxic to human health; and is therefore hazardous to drinking water systems and human health.

93.     Defendants manufactured, promoted, marketed, distributed, and/or sold products containing 1,4-dioxane, which Defendants knew or reasonably should have known would virtually certainly be discharged and release toxic 1,4-dioxane into the ground and sewer system, and intrude upon, contaminate, and damage Plaintiffs' possessory interest.

94.     Defendants' conduct constitutes a continuing unauthorized intrusion and a continuing trespass onto Plaintiffs' property.

95.     Each Defendant is a substantial factor in bringing about the contamination of the District's wells, and each Defendant aided and abetted the trespasses and is jointly responsible for the injuries and damage caused to Plaintiffs.

96.     As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiffs have incurred, are incurring, and will continue to incur damages related to 1,4-dioxane contamination of its wells in an amount to be proved at trial.

97.     Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including 1,4-dioxane contamination of drinking water wells. Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of 1,4-dioxane and/or products containing 1,4-dioxane, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiffs request an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

98.     Defendants are jointly and severally liable for all such damages, and Plaintiffs are entitled to recover all such damages and other relief as set forth below.

## VI.    Prayer for Relief

Plaintiffs Town of Huntington and Dix Hills Water District pray for judgment against Defendants, jointly and severally, awarding Plaintiffs:

a.  Compensatory damages in an amount according to proof;

b.  Punitive damages in an amount to be determined at trial;

c.  Injunctive and equitable relief, including in the form of a fund to abate the nuisance and trespass;

d.  All appropriate declaratory relief;

e.  Plaintiffs' costs in prosecuting this action, including reasonable attorneys' fees, court costs, expert fees, and other expenses of litigation;

f.  Pre-judgment interest and post-judgment interest; and

g.  All other relief this Court deems just, proper, and equitable.

## VII. Demand for Jury Trial

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs request a trial by jury of all claims asserted in this Complaint.

Dated: May 20, 2019   Respectfully submitted,

       */s/ Matthew K. Edling*
       Matthew K. Edling

       VICTOR M. SHER (*pro hac vice* application to be submitted)
       vic@sheredling.com
       MATTHEW K. EDLING
       matt@sheredling.com
       STEPHANIE D. BIEHL (*pro hac vice* application to be submitted)
       stephanie@sheredling.com
       KATIE H. JONES (*pro hac vice* application to be submitted)
       katie@sheredling.com
       TIMOTHY R. SLOANE (*pro hac vice* application to be submitted)
       tim@sheredling.com
       **SHER EDLING LLP**
       100 Montgomery St. Suite 1410
       San Francisco, CA 94104
       (628) 231-2500

       NICHOLAS CIAPPETTA
       nciappetta@huntingtonny.gov
       THELMA NEIRA
       tneira@huntingtonny.gov
       **OFFICE OF THE TOWN ATTORNEY,**
       **TOWN OF HUNTINGTON**
       Town Hall (Room 203)
       100 Main Street
       Huntington, NY 11743
       (631) 351-3042

       *Attorneys for Plaintiffs Town of Huntington*
       *and Dix Hills Water District*